# In the United States Court of Federal Claims

No. 19-1518C
(Filed Under Seal:  December 11, 2019)
(Reissued for Publication:  December 20, 2019)[*]

```
*****************************************
SYSTEM STUDIES & SIMULATION,        *
INC.,                                *
                                     *
            Plaintiff,               *
                                     *
      v.                             *
                                     *
THE UNITED STATES,                   *
                                     *
            Defendant,               *
                                     *
      and                            *
                                     *
L3 DOSS AVIATION,                    *
                                     *
            Defendant-Intervenor.    *
*****************************************
```

Postaward Bid Protest; Cross-Motions for Judgment on the Administrative Record; Evaluation of Proposals; Assignment of Strengths and Weaknesses; Best Value Tradeoff

Walter B. English, Huntsville, AL, for plaintiff.

Christopher L. Harlow, United States Department of Justice, Washington, DC, for defendant.

Kevin P. Mullen, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this postaward bid protest, plaintiff System Studies & Simulation, Inc. ("S3") contends that the United States Department of the Army, Mission and Installation Contracting Command ("MICC" or "the Agency") improperly awarded a contract for advanced helicopter flight training support at Fort Rucker to defendant-intervenor L3 Doss Aviation ("L3 Doss"). Specifically, S3 alleges that the Agency's evaluation of proposals and the subsequent tradeoff decision were flawed. Before the court are S3's and defendant's cross-motions for judgment on the

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on December 19, 2019. The redactions are indicated with bracketed ellipses ("[. . .]").

administrative record.[1]  For the reasons set forth below, the court grants S3's motion for judgment on the administrative record and its request for injunctive relief.

## I.  BACKGROUND

### A.  History of the Requirement

S3 and L3 Doss are both former incumbent contractors for this advanced helicopter flight training requirement.  Administration R. ("AR") 125.  Under a single award, indefinite delivery/indefinite quantity contract administered by the United States Army National Guard Bureau, S3 provided these services from September 14, 2009, through May 23, 2010; it then continued its performance under a noncompetitive one-year task order until May 22, 2011.  Id. at 154-55.  MICC – Fort Rucker subsequently competed the task order, using a best value tradeoff source selection method, and awarded the task order to S3 for a performance period of May 23, 2011, to May 22, 2013, which was extended to November 22, 2013.  Id. at 155.  The next contract, W911S0-14-D-0002, was awarded on a lowest price technically acceptable basis.  Id. at 123, 155.  The Agency awarded the contract to the company now known as L3 Doss on September 12, 2014, with an ordering period to end on September 15, 2018.[2]  Id. at 155.

During L3 Doss's performance of that contract, staffing concerns arose:

> L3 Doss Aviation had difficulty in providing enough Instructor Pilots (IPs) and/or Maintenance Examiners to meet the daily training capability for the number of flight students listed in the contract.  This is true even when the allowed temporary student capacity variations were applied per the contract.  Invoice decrements had to be assessed for every monthly invoice during the rating period.  The contractor had identified corrective actions to reduce the loss of contract personnel due to the favorable job market with the airlines, overseas locations and [United States Army Aviation Center of Excellence ("USAACE")] [Department of the Army civilian] hires.  Those corrective actions seem to be somewhat effective, however, L3 Doss has been unable to meet the full requirements of [Performance Work Statement ("PWS")] paragraph 5.4.2.

Id. at 3523 (citations omitted).  L3 Doss's efforts to slow instructor attrition led to ten new hires in option year three, but L3 Doss also lost ten instructors that same year.  Id.  Over the first three years of performance, the invoice decrements due to these difficulties amounted to $[. . .].[3]  Id. at

---

[1]  L3 Doss filed no motions or briefs in this matter.

[2]  The contract was awarded to Doss Aviation, Inc.  AR 1561.  That company was subsequently acquired by L3 Technologies, Inc., of which L3 Doss is a wholly owned subsidiary.  Id.

[3]  The Agency decremented $[. . .] in the first year, $[. . .] in the second year, and $[. . .]

126-27.

    In July 2017, in anticipation of the contract's expiration, the Agency issued a Sources Sought Notice.  Id. at 17-20.  Eleven offerors, including S3 and L3 Doss, responded.  Id. at 21-120.  Ultimately, the Agency resolved to solicit offers on a full and open basis.  Id. at 127-28.  Reasoning that shorter contract terms had made it difficult in the past to "recruit[] and retain[] contractors with the required unique experience and qualifications," the Agency opted to award the work for a seven-year term.  Id. at 147.  Regarding the technical risk of the contract, the Agency commented:

> The technical risk is Moderate.  The ability to adequately staff qualified personnel is critical to the accomplishment of the mission.  If the contractor's instructor pilot trainer and management staffing is inadequate, either due to lack of sufficient number of personnel or lack of properly qualified personnel, the quality and validity of the service will be degraded.

Id. at 156.  The Agency also determined that the schedule risk would be moderate, offering the following explanation:

> The Army cannot meet aviation requirements in the field . . . if the Soldiers are not receiving the necessary training in the advanced airframes; this creates an undue burden by straining existing resources.  The Army's training mission does not stop for inclement weather or lack of training instructors.  Contractor support helped eliminate the training backlog from years past.  Another potential risk is the contractor's ability to adapt to shifting priorities and Army mission recruiting goals without any degradation of services.  A potential risk involves the contractor's ability to ensure a smooth transition (phase-in) with no negative impact on training and a full level of performance.
>
>     For mitigation of these risks, the Government is using a performance-based PWS which permits the contractor the flexibility to devise solutions in meeting the operational needs of the Advanced Helicopter Flight Training Support requirements.  To reduce this risk, the contractor needs to have enough instructors to cover daily training requirements in case of illness, weather delays, or a student surge in relation to specific airframes.  The Government will mitigate the above schedule risks through evaluation of the offeror's management approach, past performance record in relation to staying on schedule/meeting deadlines and recruitment/retention plans.  Training delays due to weather are made up on a weekend which allows for the students to graduate on time and eliminates any potential backlog from occurring.

Id. at 157.

---

in the third year.  AR 126-27.

### B.  The Solicitation

The Agency issued solicitation W9124G-18-R-0009 on June 25, 2018,[4] to acquire advanced helicopter flight training support for the USAACE at Fort Rucker, Alabama.  Id. at 244, 256.  The mission of the USAACE, the solicitation noted, was "to provide the Army with professionally trained aviators and non-rated crew members through planning, coordinating and executing formal flight instruction at the undergraduate and graduate level."  Id. at 520.  In support of this mission, the Agency sought to provide the USAACE with "[f]light training support to execute the advanced rotary wing training courses"; "[b]alanced training for all student pilots by preparing them for the field in 'Go to War' aircraft"; and "[s]upport of EURO-NATO and Foreign Military Training."  Id.  The PWS outlined the following minimum daily training requirements by airframe:

- UH-60A/L Instructor Pilots – training capacity for 16 flight students
- UH 60A/L Maintenance Examiners – training capacity for 12 flight students
- AH-64D Instructor Pilots – training capacity for 64 flight students
- CH-47F Instructor Pilots – training capacity for 16 flight students
- CH-47F Flight Engineers Non-Rated Crew Members – support capability for 5 aircraft

Id. at 532.  The Agency would award a single firm, fixed price contract for a thirty-day phase-in period, an eleven-month base period, and six one-year option periods.  Id. at 144-45.

Prior to the solicitation's release, the Agency was notified that some sensitive source selection information had been released to at least one potential offeror.  Id. at 684.  These documents included the Independent Government Cost Estimate, briefing slides, and a variety of other documents related to the solicitation.  Id. at 690-92.  To avoid a potential competitive advantage, the Agency released these documents publicly as part of the solicitation.  Id. at 684.

Section M of the solicitation described how the Agency planned to evaluate the proposals.  Id. at 588-95.  With respect to the substance of the evaluations, the Agency stated that it intended to award the contract to the offeror "whose proposal represents the best value after evaluation in accordance with the factors in the solicitation by utilizing the trade-off process." Id. at 588.  The solicitation outlined five such factors:  (1) technical capability, (2) staffing and management approach, (3) past performance, (4) small business participation, and (5) price.  Id. The relative importance of the factors was described as follows:

Factor 1 (Technical Capability) and Factor 2 (Staffing and Management

---

[4]  The solicitation was subsequently amended on seven different dates:  July 23, 2018; August 3, 2018; August 10, 2018; August 28, 2018; August 30, 2018; September 6, 2018; and September 10, 2018.  AR 380-507 (solicitation amendments), 508-95 (conformed solicitation).

Approach) are of equal importance and are more important [than] all other non-price factors.  Factor 3 (Past Performance) is more important than Factor 4 (Small Business Participation).  In accordance with [Federal Acquisition Regulation ("FAR")] 15.304(e)(2), all non-price factors combined are significantly more important than Factor 5 (Price).

Id.  The Agency also advised:

Although price is the least important evaluation factor, it has the potential to become more significant during the evaluation process.  The degree of importance of price will increase with the degree of equality of the proposals in relation to the other factors on which selection is to be based.  The importance of price will also increase when a proposal's price is so significantly high as to diminish the value to the Government that might be gained under the other aspects of the offer.  If, at any stage of the evaluation, all offerors are determined to have submitted equal, or virtually equal, non-price proposals, price could become the factor in determining which offerors shall receive the award.

Id. at 588-89.

Three of the factors are relevant to this protest:  technical capability, staffing and management approach, and past performance.  For the technical capability factor, the Agency provided that it would evaluate "whether the offeror's technical capability demonstrates the offeror's understanding of the requirements, capabilities, experiences, and abilities to execute the tasks described in the PWS."  Id. at 589.  For the staffing factor, the Agency indicated that it would evaluate whether the offeror "demonstrates an understanding of the personnel requirements of the PWS as well as the ability to provide the personnel with the experience, qualifications, and clearances necessary to perform and manage all tasks described in the PWS by the contract start date," specifically including the following criteria:

- Whether the Offeror identified its subcontractors, teaming partners or joint venture partners and described who will be used to perform this requirement by task and percentage of cost.

- Whether the proposed organizational chart displays positions, decision authority, and what parts of the organization are responsible for managing and accomplishing each task.

- Whether the Offeror's proposed hiring, training and retention plan provides an adequate number of properly qualified personnel, as specified in the PWS, necessary to perform and manage the contract's requirements.

- Whether the Offeror identified its proposed staffing (by number of personnel, labor category and company) and any plans to cross-utilize or rely

on reach-back, part-time or temporary personnel during contract performance.

- Whether the offeror identified the names of the Key Personnel who will perform under this contract, provided resumes that clearly demonstrate that they satisfy or possess all applicable certifications and other qualifications required for their designated positions and provided Letters of Commitment signed within 60 days of the due date for proposal submission.

- Whether the Offeror proposed [a] plan to execute the Employee Training Agreement Program as specified in PWS 1.6.17 and provided a copy of the agreement that the Offeror / Contractor intends to enter into with its affected employees.

Id. For both the technical capability factor and staffing factor, evaluators would designate strengths, weaknesses, significant weaknesses, deficiencies, and risks.[5] Id. at 590. The Agency further described "risk" as follows:

| Adjectival Rating | Description |
|---|---|
| Low | Proposal may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |
| Moderate | Proposal contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to cause significant disruption of |

---

[5] A "strength" is "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." AR 590. A "weakness" is "a flaw in the proposal that increases the risk of unsuccessful contract performance." Id. A "significant weakness" is "a flaw that appreciably increases the risk of unsuccessful contract performance." Id. A "deficiency" is "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." Id. "Risk" is "the potential for unsuccessful contract performance," and "[t]he consideration of risk assesses the degree to which an offeror's proposed approach to achieving the technical factor or sub-factor may involve risk of disruption of schedule, degradation of performance, the need for increased Government oversight, and the likelihood of unsuccessful contract performance." Id.

| | | service, increased cost or degradation of performance.  Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |
| Unacceptable | | Proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level. |

Id.  Evaluators would then assign adjectival ratings based on a combined technical/risk ratings table:

| Technical Rating | Description |
| --- | --- |
| Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable.  Proposal is unawardable. |

Id. at 589-90.

For the past performance factor, the Agency would "assess the relative risks associated with an Offeror's likelihood of success in performing the solicitation's requirements as indicated by that Offeror's record of past performance."  Id. at 590.  Its risk assessment would encompass consideration of recent and relevant past performance.[6]  Id. at 591.  The Agency outlined adjectival ratings for the relevancy of the past performance:

---

[6]  The solicitation classified recent performance as ongoing contracts, or those contracts performed within three years of the solicitation's issuance.  AR 591.

| Rating | Description |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort this solicitation requires. |

Id. at 592.  The Agency provided the following adjectival ratings:

| Adjectival Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned.  The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

Id. at 593.

## C.  Initial Evaluation of Proposals

The initial proposal deadline was July 25, 2018, id. at 316, but was later extended to September 12, 2018, id. at 441.  Seven offerors submitted timely proposals:  L3 Doss; S3; [. . .], [. . .]; the [. . .]; [. . .] ("[. . .]"); [. . .]; and [. . .] ("[. . .]").  See generally id. at 843-3168 (proposals).

Once the solicitation had closed, the proposals were evaluated by the Agency's Source Selection Evaluation Board ("SSEB"). Id. at 3575. The SSEB relied, in part, on assessments of Factor 1 and Factor 2 by the Technical Evaluation Team, id. at 3274-460; assessments of Factor 3 by the Past Performance Evaluation Team, id. at 3499-548; and a Cost and Price Evaluation Report from the Contract Price Cost Analyst, id. at 3549-74. Based on these assessments, the Agency established a competitive range and initiated discussions with [. . .], [. . .], S3, and L3 Doss. Id. at 3616. The other offerors each received a rating of "unacceptable" for the staffing factor and were thus excluded from the competitive range. Id. at 3596, 3616.

## D.  Discussions and Final Proposal Revisions

On August 7, 2019, the Agency sent Evaluation Notices and requests for final proposal revisions to [. . .], [. . .], S3, and L3 Doss. Id. at 4378. Each offeror submitted a timely response. Id.

As part of the Technical Evaluation Team's final assessment, it evaluated the offerors' strengths for the first two factors. Id. at 4259-78, 4280-86. For the technical capability factor, S3 received two strengths, id. at 4275, and L3 Doss received one strength, id. at 4268. For the staffing factor, S3 received a strength for its "[. . .]," which included [. . .], [. . .], [. . .] to recruit qualified teammates, and [. . .]. Id. at 4279. Although S3 proposed to hire [. . .] to oversee the [. . .], it did not receive a strength for this aspect of its proposal. Id. at 2015, 4279. L3 Doss received three strengths for the staffing factor:  (1) [. . .]; (2) plans to hire a [. . .]; and (3) the "[. . .]" it proposed "[. . .]." Id. at 4272. [. . .] received two strengths. Id. at 4286. Although the Agency expressed concern that [. . .] planned to use [. . .] id. at 4285, the Agency did not assign a weakness for that component of the proposal, id. at 4286. [. . .] received six strengths related to the staffing factor, including one strength for its plan to hire [. . .]. Id. at 4264-65.

For the past performance factor, each offeror submitted references for past or ongoing contracts. Id. at 3499-548. S3 offered six such references.[7] Id. at 3529. The first reference, for helicopter training services, was classified as recent and very relevant, with a rating of substantial confidence. Id. The second reference, for flight training services, was classified as partially recent and very relevant, with a rating of satisfactory confidence. Id. The third reference, also for helicopter training, was classified as recent and relevant, with a rating of substantial confidence. Id. The fourth reference, for Blackhawk helicopter training, was classified as partially recent and relevant, with a rating of satisfactory confidence. Id. The fifth and sixth references, both for helicopter training, were classified as recent and relevant, with ratings of satisfactory confidence. Id.

L3 Doss submitted four past performance references. Id. at 3522. The first reference, for the prior contract, was classified as recent and very relevant, with a rating of satisfactory confidence. Id. The second reference, for fixed-wing aircraft training and other services, was

---

[7]  For the third, fourth, and fifth references, S3 performed the work as a subcontractor. AR 3529.

classified as partially recent and relevant, with a rating of substantial confidence.  Id.  The third reference, for fixed-wing aircraft training and other services, was classified as recent and relevant, with a rating of satisfactory confidence.[8]  Id.  The fourth reference,[9] for simulator training, was classified as partially recent and somewhat relevant, with a rating of satisfactory confidence.  Id.

[. . .] submitted four past performance references.  Id. at 3516.  The first reference, for live flight and simulator-based training, was classified as recent and relevant, with a rating of substantial confidence.  Id.  The second reference, for unmanned aerial vehicle flight instruction, was classified as recent and relevant, with a rating of satisfactory confidence.  Id.  The third reference,[10] for fixed-wing flight training, was classified as recent and somewhat relevant, with a rating of satisfactory confidence.  Id.  The fourth reference,[11] for helicopter training, was classified as recent and somewhat relevant, with a rating of satisfactory confidence.  Id.

[. . .] submitted one past performance reference, for a contract involving helicopter training.  Id. at 3545.  Regarding the staffing of this contract, one military reference expressed concern:

> [. . .] is currently having issues with hiring enough instructor pilots to fill the demand.  Although there is a shortage of pilots across the United States, I feel the company could do better at recruiting and providing compensation that resulted in the number of instructors required to meet the government requirements.

Id. at 3547.  The reference was classified as recent and very relevant, with a rating of substantial confidence.  Id.

Incorporating the evaluations of the SSEB, the Source Selection Authority ("SSA") assigned the offerors the following final ratings:

---

[8]  For this contract, L3 Doss's graduation rates fell below the 90% required by the PWS. AR 3526.  To address this deficiency, L3 Doss provided the Agency with a "Get Well Plan" on October 6, 2017.  Id.  The plan sought "support or relief in several areas to help alleviate some of [L3 Doss's] late programmed student graduations . . . ."  Id.  The Agency accepted and implemented the plan.  Id.  The plan "was successful in conjunction with the significant concessions granted by the government, which also included significant reductions in student numbers during the last quarter of CY17."  Id.

[9]  [. . .], a subcontractor of L3 Doss, performed this contract.  AR 3522.  Under L3 Doss's proposal for the contract at issue, [. . .] would provide [. . .] of the total effort.  Id.

[10]  [. . .], a subcontractor of [. . .], performed this contract.  AR 3519.

[11]  [. . .], a subcontractor of [. . .], performed this contract.  AR 3520.

|  | L3 Doss | [. . .] | S3 | [. . .] |
|---|---|---|---|---|
| Factor 1 – Technical Capability | Good | Good | Outstanding | Outstanding |
| Factor 2 – Staffing and Management Approach | Good | Good | Good | Outstanding |
| Factor 3 – Past Performance | Satisfactory Confidence | Substantial Confidence | Substantial Confidence | Satisfactory Confidence |
| Factor 4 – Small Business Participation | Good | Good | Good | Good |

Id. at 4390.  The SSA also noted the final proposed and evaluated prices:

| Offeror | Total Proposed Price | Total Evaluated Price (inclusion of FAR 52.217-8) |
|---|---|---|
| L3 Doss | $[. . .] | $[. . .] |
| [. . .] | $[. . .] | $[. . .] |
| S3 | $[. . .] | $[. . .] |
| [. . .] | $[. . .] | $[. . .] |

Id. at 4349.  The Agency found each of the proposed prices to be fair, reasonable, realistic, and balanced.  Id. at 4450.

## E.  The Source Selection Decision

The SSA prepared a Source Selection Decision Document, evaluating the final proposals and conducting a best value tradeoff.  Id. at 4376-465.  The decision included a comparison of L3 Doss and S3's respective ratings for Factors 1 through 4:

> An analysis of S3's proposal against L3's proposal indicates that they are substantially the same with S3 receiving a slightly higher rating of "Outstanding" in Factor 1 (Technical Capability), while L3 received a rating of "Good" in Factor 1.  Both offerors received a rating of "Good" in Factor 2 (Staffing and Management Approach).  S3 received two (2) strengths in Factor 1 for [its] proposed [. . .] and for having experience on similar requirements, both of which are beneficial to the Government.  L3 received one (1) strength in Factor 1, as the incumbent and having the experience, continuity, and greater familiarity with the requirement, which would be beneficial to the Government.  L3 received three (3) strengths in Factor 2 for having [. . .].  This is a benefit to the Government because it could induce less turnover of the experienced workforce and maintain a fully trained staff.  No weaknesses were indicated in either of the proposals once negotiations were concluded.  L3 received a "Satisfactory Confidence" rating and

-11-

S3 received a slightly higher "Substantial Confidence" rating in Past
Performance, Factor 3, and both received a rating of "Good" in Factor 4, Small
Business Participation.

Id. at 4462.  The SSA also addressed the price difference between the L3 Doss and S3 proposals:

> In the price factor, S3's total evaluated price was $[. . .] while L3 proposed
> $[. . .].  Both offerors' pricing was determined to be reasonable and realistic.
> However, after an examination of their total price and the determination that S3
> has strengths that were identified in [its] proposal as being beneficial to the
> Government, their proposal did not offer a trade-off to the Government that would
> justify paying $[. . .] more than proposed by L3.  It would not be prudent or
> advantageous to the Government and would not yield any long-term benefits to
> the program overall.[12]

Id. at 4463 (footnote added).  Finally, the SSA provided the following summary of her decision:

> [A]lthough price is the least important evaluation factor, it has the potential to
> become more significant during the evaluation process.  The solicitation provided
> that the degree of importance of price will increase with the degree of quality of
> the proposals in relation to the other factors on which selection is to be based.
> The importance of price will also increase when a proposal's price is so
> significantly high as to diminish the value to the Government that might be gained
> under the other aspects of the offer.  If, at any stage of the evaluation, all offerors

---

[12]  The SSA used very similar language to compare L3 Doss's price proposal to those of
the other offerors.  Regarding [. . .], the SSA stated:

> Although [. . .] has strengths that were identified in [its] proposal that were
> beneficial to the Government, [its] proposal did not offer a trade-off to the
> Government that would be beneficial enough to justify paying $[. . .] more than
> proposed by L3.  Paying the higher price would not be advantageous to the
> Government and would not yield any long-term benefits to the program.

AR 4462.  And regarding [. . .], the SSA stated:

> Both proposals were determined to be reasonable and realistic.  Although the
> analysis indicates that [. . .]'s technical proposal is slightly higher than proposed
> by L3, [it] did not offer a tradeoff that would justify or yield substantial benefits
> to paying $[. . .] more than proposed by L3.  Paying the much higher price would
> not be a prudent business decision and would not yield any long-term advantages
> to the overall program.

Id. at 4464.

are determined to have submitted equal, or virtually equal, non-price proposals, price could become the factor in determining which offerors shall receive the award.  The determining factor considering the non-price factors, has become price with the evaluation of the offeror's proposals in the competitive range. Therefore, it has been determined that L3-Doss is the responsible offeror whose proposal conforms to the solicitation requirements and offers the best value to the Government, based on a comparative assessment of proposals against all source selection criteria in the solicitation.

Id. at 4464-65.  Accordingly, the SSA decided to award the contract to L3 Doss.  Id.

On September 16, 2019, the Agency informed S3, [. . .], and [. . .] that it had awarded the contract to L3 Doss.  Id. at 4525-82.  S3, [. . .], and [. . .] requested written postaward debriefings, which they each received on September 20, 2019.  Id. at 4632-73.

### F.  This Bid Protest

On October 1, 2019, S3 filed the instant protest.  In its complaint, it alleges that the Agency (1) evaluated offerors unequally by failing to grant S3 a strength under the staffing factor[13] and (2) engaged in source selection analysis that was irrational, arbitrary, capricious, an abuse of discretion, and contrary to law.  It asks the court to enter an injunction, enjoining the Agency from proceeding with performance of this contract pending the decision in this protest, and require the Agency to reevaluate the proposals by performing a new tradeoff analysis and making a new award decision.  L3 Doss subsequently, and successfully, moved to intervene to defend its receipt of the contract against the allegations that the Agency improperly evaluated its proposal.  Pursuant to the schedule proposed by the parties, briefing on cross-motions for judgment on the administrative record concluded on November 26, 2019, and the court heard argument on December 6, 2019.  The motions are now ripe for adjudication.

### II.  DISCUSSION

In ruling on motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the record."  Bannum, 404 F.3d at 1356.

---

[13]  S3 initially contended, in its motion for judgment on the administrative record, that the Agency improperly failed to assign a weakness to [. . .].  After additional briefing, however, S3 and defendant concluded that the alleged error was not relevant to this protest.  As previously noted, L3 Doss expressed no opinion on this matter.

## A.  Legal Standards

The court reviews challenged agency actions pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4) (2018).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (2001)); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, Inc., 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  And, when a contract is to be awarded on a "best value" basis, procurement officials have "even greater discretion than if the contract were to have been awarded on the basis of cost alone."  Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).  Consistent with the deference accorded to procuring agencies conducting negotiated procurements, when a protestor challenges a procuring agency's evaluation of a technical proposal, the court's "review . . . should be limited to determining whether the evaluation was reasonable, [was] consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements."  Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 381 (2003), aff'd, 365 F.3d at 1345; accord E.W. Bliss Co., 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not

-14-

second guess.").

"[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (quoting Andersen Consulting Co. v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992). Thus, in addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc., 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protest was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote Corp. of Am., 365 F.3d 1345, 1350 (Fed. Cir. 2004) (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

## B.  The SSA's Evaluation of the Staffing and Management Factor Did Not Prejudice S3

S3 first contends that the Agency unequally assigned strengths to the offerors under the staffing factor.  Specifically, S3 asserts that although S3, L3 Doss, and [. . .] each proposed to hire [. . .], only L3 Doss and [. . .] were assigned a strength for this feature.  Defendant does not defend the Agency's failure to award S3 a strength for this aspect of its proposal, but instead contends that this alleged error did not prejudice S3.

Had the Agency properly assigned S3 a strength for its [. . .], S3 would have two strengths to L3 Doss's three.  As defendant emphasizes, this alteration would not have pushed S3 past the "good" adjectival rating it shared with L3 Doss.  However, the court's inquiry does not end here, for "[w]hen the government is required to perform a best-value tradeoff analysis, it cannot limit its comparison of the proposals to the ratings assigned to them by lower-level evaluators."  Firstline Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 378 (2011).  Instead, the court must determine whether S3 had a "substantial chance" of earning the contract award had it been assigned this particular strength.  The court finds no such prejudice here.  While S3 emphasizes that the SSA is required to evaluate individual strengths and weaknesses, instead of relying solely on the adjectival ratings themselves, S3 does not explain how this strength might have changed its standing in relation to the other proposals.[14]  Rather than distinguishing S3 from

---

[14]  A similar lack of demonstrated prejudice was also noted in a previous S3 postaward bid protest, one the parties extensively discussed in their briefs.  See Sys. Studies & Simulation, Inc. v. United States, No. 18-1494C, 2019 WL 912277, at *7 (Fed. Cl. Jan. 22, 2019) ("S3 . . . points to no evidence in the administrative record to show that it would have had a substantial chance of being awarded the Task Order at issue under circumstances where its quotation received the same evaluation ratings as [the awardee's] quotation under the [agency's] non-price

L3 Doss in relation to the staffing factor, this [. . .] strength would only have made the similarities between the two proposals more obvious.

The court has previously observed that "[t]here is no such thing as a perfect procurement," Amazon Web Servs. v. United States, 113 Fed. Cl. 102, 116 (2013), a principle that holds true here.  And this particular imperfection, viewed in isolation, does not effect the prejudice necessary to invalidate the SSA's conclusion.

### C.  The SSA's Source Selection Decision Was Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law

Next, S3 contends that the SSA based her analysis on a flawed past performance evaluation, failed to properly document her tradeoff analysis, and improperly converted the solicitation to a lowest price technically acceptable procurement.  These errors, S3 alleges, make the SSA's decision arbitrary, capricious, an abuse of discretion, and contrary to law.

### 1.  Evaluation of the Past Performance Factor

S3 contests the SSA's evaluation of L3 Doss's past performance, maintaining that the SSA failed to properly account for L3 Doss's staffing issues on prior contracts.  The qualitative assessments involved in evaluating past performance "lie at the heart of the Agency's prerogative, since it is the agency that must bear the burden of any difficulties resulting from a defective evaluation, and we will not substitute our judgment for a reasonably based past performance rating." DynCorp Int'l LCC v. United States, 139 Fed. Cl. 481, 489 (2018) (internal quotation marks omitted).  Thus, "when a Court reviews an evaluation of past performance . . . , 'the greatest deference possible is given to the agency . . . .'" Walden Sec. v. United States, 136 Fed. Cl. 216, 229 (2018) (quoting Gulf Grp., Inc. v. United States, 61 Fed. Cl. 338, 351 (2014)).  Exercising this deference, the court finds no error with the SSA's evaluation of L3 Doss's past performance.

During the evaluation of L3 Doss's past performance references, its previous scheduling issues were thoroughly discussed.  The story told by these references is not as bleak as S3 suggests.  While L3 Doss's first reference (for the current requirement) noted that L3 Doss "ha[d] been unable to meet the full requirements of [the] PWS," it also observed that such issues "were not necessarily a reflection of [L3 Doss], but of challenges in the industry and location of the training." AR 3524.  L3 Doss's third reference also described flight instructor shortages that negatively impacted graduation rates, but concluded that "[e]fforts taken by L3 Doss did correct the performance issue and [L3 Doss was] performing to standards by the end of the period." Id. at 3526-27; see also id. at 3527 (attributing the improvement in part to the change in L3 Doss's ownership).  And critically, despite these issues, each of L3 Doss's four references indicated that they would recommend L3 Doss for future government contracts.  See id. at 3233, 3524-25, 3528; see also id. at 3524 ("In relation to customer satisfaction, the Army's assessing official

evaluation factors.").

indicated the Doss Aviation management team possesses and displays exceptional insight into Army Aviation training.").

Once these references reached the SSA, she appropriately took them into account. Far from ignoring these past performance issues, or blindly accepting the commentary of the Past Performance Evaluation Board, the SSA independently considered the causes, effects, and resolution of the staffing shortages. See, e.g., id. at 4463 (noting that L3 Doss has "[. . .]," and observing that short-term contracts "ma[de] it difficult to retain qualified individuals without the assurance of continued employment"), 4464 (concluding that "L3 has shown significant improvement in the areas identified regarding retention of qualified instructors and [. . .]"). The SSA thus crafted a conclusion that was not only independent, but also thoroughly consistent with the administrative record.

As defendant emphasizes, the Agency is uniquely qualified in this case to evaluate L3 Doss's past performance. The Agency has interacted with L3 Doss as an offeror on this solicitation, as the incumbent on the current contract, and as a competitor in an industry where pilots of the kind necessary here are in short supply. Based on this multifaceted relationship, on the thorough references provided to the Past Performance Evaluation Board, and on the SSA's engagement with those references, the SSA's evaluation of L3 Doss's past performance was reasonable.

## 2. Tradeoff Analysis

While the court does not find error with the Agency's evaluation of the past performance factor itself, the weighing of the overall proposals is a separate matter. S3 asserts that the SSA failed to engage in a proper tradeoff analysis, effectively converting this acquisition to a lowest price technically acceptable procurement, and the court concurs.

Under the FAR, a procuring agency must document its source selection decision, and that documentation must "include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs." FAR 15.308 (2016). This tradeoff analysis "obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price." Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008). Moreover, even if a solicitation provides that technical evaluation criteria are more important than price, the "magnitude of the price differential" between two proposals remains relevant because "logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase." Id.

As S3 emphasizes, L3 Doss received the lowest combined rating of any offeror in the competitive range. See AR 4349. While L3 Doss's proposal also boasted the lowest price, its price was only 6% lower than that proposed by S3. If the SSA determines that such a tradeoff offers the best value to the government, she must document her analysis and conclusion thoroughly. The possibility that "the SSA, in [her] own mind, made such cost/benefit

-17-

comparisons, but merely failed to capture them on paper," Serco Inc., 81 Fed. Cl. at 498, does not satisfy the FAR's documentation requirements.

Throughout the source selection decision, the SSA attempted to equalize the relative merits of the four offerors in the competitive range. The SSA, in her comparative analysis, acknowledged the rating differences between S3 and L3 Doss, but nonetheless concluded that their proposals were "substantially the same." AR 4462. Her comparative analysis of L3 Doss and [. . .] employed the same language. See id. at 4461. The SSA also attempted to smooth over any significant differences between the proposals by repeatedly emphasizing the government's "reasonable expectation" that both L3 Doss and its competitors could "successfully perform the services required in the solicitation." Id. at 4463 (comparing L3 Doss to S3); see also id. at 4464 (comparing L3 Doss to [. . .]). Assertions that an offeror is "more than adequate," or similar assurances of acceptability, "ha[ve] no place in a best-value tradeoff analysis." Firstline Transp. Sec., 100 Fed. Cl. at 377. Notably, the SSA summarizes her analysis by declaring that because the non-price aspects of the proposals were "equal, or virtually equal," . . . "[t]he determining factor . . . has become price . . . ." AR 4464. In short, the SSA "minimized the real differences between the proposals and created a false impression of equivalence, thus allowing [her] to base [her] decision largely on price instead of on the non-price factors." Firstline Transp. Sec., 100 Fed. Cl. at 379. Not only does this "false impression of equivalence" contravene the FAR, but such "generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions." Serco Inc., 81 Fed. Cl. at 497.

Had she been faced with a significant price difference, the SSA's rejection of the higher-price proposals would have been less glaring. But the relatively small difference between the proposed prices further highlights the inadequacy of her analysis. L3 Doss proposed a price approximately 3% lower than [. . .]'s, approximately 6% lower than S3's, and approximately 16.5% lower than [. . .]'s. See id. at 4349. Rather than actively weighing the offerors' nonprice ratings versus their price premiums, the SSA provided only conclusory statements regarding the advantage to the government and the long-term benefits to the program.

The inescapable result of this flawed analysis was prejudice to S3. The SSA's attempts to equalize the technical differences between the proposals is a significant flaw, one that cannot be disentangled from her ultimate decision. See Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 767 (2008) (finding prejudice in part because "when the [SSA] concluded that a higher-priced proposal that had received a higher adjective . . . rating was technically superior, she would often note the superiority and then proceed to either downplay it as 'slight' or 'not unlimited' . . ."). Moreover, of the offerors in the competitive range, S3 was only out-scored by [. . .], whose price was considerably higher. See AR 4390, 4349. Thus, the court determines that but for the Agency's error, S3 had a substantial chance of being awarded the contract.

### D. S3 Is Entitled to Injunctive Relief

Because S3 has established the existence of a significant, prejudicial procurement error, the court must address its request for injunctive relief. The United States Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is

-18-

guided in making such an award by RCFC 65(d).  In determining whether to award a permanent injunction, a court must consider whether (1) the protestor has succeeded on the merits; (2) the protestor will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.[15]  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

### 1.  Success on the Merits

As discussed above, S3 has succeeded on the merits of its protest in one regard—the SSA did not conduct the proper tradeoff analysis, an error which invalidates the Agency's best value determination.  See supra Section II.C.2.  The first factor, therefore, weighs decidedly in S3's favor.

### 2.  Irreparable Harm

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000) (citation omitted).  The United States Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.  See CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390-91 (2010); Serco Inc., 81 Fed. Cl. at 501-02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002).

Over the course of this contract's performance, S3 stood to gain over $[. . .] million in revenue.  See AR 4349.  Moreover, considering the thirty-day phase-in period, the eleven-month base period, and the six one-year option periods, this contract could last for a total of seven years.  See id. at 144-45.  S3 stands to lose not simply the monetary value of the contract (a substantial sum), but also the training opportunities that would naturally stem from performance of the contract.[16]  See Femme Comp, 83 Fed. Cl. at 772 ("[A]ny offeror that should have been awarded a contract, but was not, will be at a disadvantage when competing for future contracts. No adequate remedy exists to make up for this potential loss of . . . competitive advantage.").  Accordingly, the evidence in the administrative record adequately demonstrates that S3 will suffer irreparable harm if injunctive relief is not provided.

---

[15]  Defendant contends in its cross-motion that S3 cannot show success on the merits but does not articulate any specific objections to the other elements.

[16]  The history of this procurement reveals the value the offerors assigned to such training resources.  In July 2018, L3 Doss filed an agency-level protest (ultimately denied), alleging that the Agency "ha[d] provided [S3] access to Army resources for training Instructor Pilots, and thereby ha[d] created an unfair competitive advantage for this solicitation and similar procurements in the future."  AR 623; see also id. at 526, 532 (describing the qualification training provided by the government to contractor personnel).  The concerns L3 Doss voiced in this protest demonstrate the potential competitive advantage of these resources.

### 3.  Balance of Hardships

Under the next factor, "the court must consider whether the balance of hardships leans in plaintiff's favor," requiring "a consideration of the harm to the government and to the intervening defendant." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715 (2006).  Although injunctions inevitably cause the government some delay, "only in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." Id. (quoting Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 399 (1999)); accord Serco Inc., 81 Fed. Cl. at 502.

As discussed above, foregoing injunctive relief could cause S3 irreparable injury, financial and otherwise.  The government, meanwhile, has asserted no countervailing hardship to outweigh these financial and educational harms.  See Wetsel-Oviatt Lumber Co. v. United States, 43 Fed. Cl. 748, 753-54 (1999) ("[T]he balance of hardship tips in favor of the plaintiff where . . . the government fails to articulate any harm that it will endure if the injunction is granted").  Furthermore, with respect to any increase in administrative costs, any hardship to the government stems from the Agency's own failure to properly conduct the best value tradeoff.  Thus, the court determines that this element too weighs in S3's favor.

### 4.  Public Interest

Finally, "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003); see also Bilfinger Berger AG Sede Secondaria Italiana v. United States, 94 Fed. Cl. 389, 393 (2010) ("The public interest in preserving the integrity and fairness of the procurement process is served by enjoining arbitrary or capricious agency action . . . .").  Here, the public interest is best served by requiring the government to comply with federal procurement law–law that was intended to promote competition.

### III.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

For the reasons discussed above:

1.  The court **DENIES** defendant's cross-motion for judgment on the administrative record.

2.  The court **GRANTS** S3's motion for judgment on the administrative record.

3. The court **ENJOINS** the Agency from proceeding with the performance of the contract awarded to L3 Doss.

4. The court **ORDERS** the Agency to reevaluate the proposals in the competitive range and render a new Source Selection Decision, performing a new tradeoff analysis and assigning each factor the appropriate weight in accordance with this court's decision.

5. The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Thursday, December 19, 2020**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed reactions clearly indicated.**

6. The clerk is directed to enter judgment in favor of S3, consistent with this opinion.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge